(C.D. 4279)

VICTOR MACHINERY EXCHANGE, INC. *v.* UNITED STATES

United States Customs Court, First Division

(Decided October 7, 1971)

*Siegel, Mandell & Davidson (Joseph S. Kaplan* and *Brian S. Goldstein* of counsel) for the plaintiff.

*L. Patrick Gray, III,* Assistant Attorney General (*Frederick L. Ikenson* and *Robert Blanc,* trial attorneys), for the defendant.

Before WATSON, MALETZ, and RE, Judges

MALETZ, Judge: The issue in this case concerns the proper rate of duty on certain "dial bore gauges" that were imported from Japan through the port of New York in 1966. The articles were classified upon liquidation under the provision in item 710.65 of the tariff schedules for calipers and micrometers and assessed duty at the rate of 20 percent.

Plaintiff claims that the articles are not within the common meaning of the term "calipers" or "micrometers" as used in item 710.65 of the tariff schedules. Accordingly they are claimed to be properly dutiable

at the rate of 15 percent under item 710.80 which covers non-optical measuring or checking instruments, apparatus, and machines not specially provided for (including gauges). And on this aspect, the parties have agreed that should the court find item 710.65 inapplicable to the present importations, they are properly dutiable under the claimed item 710.80. Against this background, the basic question is whether or not the importations fall within the common meaning of the term "calipers" as used in item 710.65.

The relevant statutory provisions read as follows:

Schedule 7, Part 2, Subpart C:

> Drafting machines * * * micrometers, calipers, gauges, balancing machines, and non-optical measuring or checking instruments, apparatus, and machines not specially provided for * * *

| | | |
|---|---|---|
| * * * * * * * | | |
| 710. 65 | Calipers and micrometers, and parts thereof _____ | 20% ad val. |
| * * * * * * * | | |
| 710. 80 | Other _____ | 15% ad val. |

The imported dial bore gauge is used for comparing the diameter of the hole or bore of a cylinder in production with the diameter of a master cylinder in order to determine how much off norm the hole in the work piece is from the known standard. Essentially the import consists of (i) a dial gauge which has a clock-like face and several sweep hands; (ii) a spindle which resembles in appearance a small tack hammer; and (iii) various size pin and ring attachments.

In operation, the dial gauge is fastened into the spindle which has a fixed point and three movable points of contact. In turn, the end of the spindle containing the points of contact is placed in the master cylinder which has a diameter of known accuracy. At the point where the contacts in the spindle meet the inside surface of the master cylinder, the indicator in the dial gauge is set at zero. The import is then ready for use—which consists of its being placed in the hole or bore of the cylinder desired to be tested to determine the extent (if any) that the hole varies in diameter from the diameter of the master cylinder. This procedure does not produce an absolute measurement of diameter but measures the difference in diameter between the master cylinder and the diameter of the hole being tested.[1]

As we have seen, the sole question before us is whether or not the importations are within the common meaning of the term "calipers."

---

[1] By using the imported dial bore gauge in conjunction with other instruments, it is possible to obtain an absolute diameter measurement of a hole. However, commercially the import is not utilized in that manner.

Arguing in the negative, plaintiff contends that to constitute a "caliper" within its common meaning, an article must possess two legs or jaws fastened together, with the distance between the points representing a measurement taken. Continuing, plaintiff states that the present importation does not fall within this common meaning since it does not have legs or jaws and does not produce a measurement but rather indicates on a dial the difference between the diameter of the master cylinder and the bore being tested. Defendant argues to the contrary that it is not necessary that a measuring instrument have conventional legs or jaws to be considered a caliper. In addition, it urges that the court should give great weight to the testimony of its expert witnesses that the importation is a "caliper."

Turning now to the law, it is basic that tariff laws are written in the language of commerce, and that the commercial meaning of a tariff term is presumed to be the same as the common meaning in the absence of a contrary commercial designation. Common meaning, it is equally clear, is a matter of law to be determined by the court for which purpose the court may consult dictionaries, receive evidence and rely upon its own knowledge of matters within its own understanding. E.g., *United States* v. *O. Brager-Larsen*, 36 CCPA 1, C.A.D. 388 (1948). And while testimony as to the common meaning of a term is not binding on the court, it frequently may be of great aid. E.g., *United States* v. *J. J. Gavin & Co.*, 23 CCPA 288, T.D. 48164 (1936).

With these considerations in mind, we now examine the record which consists of the testimony of one witness for the plaintiff and two for the defendant. Plaintiff's witness—Bert Freidus, the president of the plaintiff company—testified that his company was in the business of buying and selling precision tools and cutting tools. He described the operation of the importation and testified that it was used by manufacturers to determine the difference in inside diameter between a bore being produced and the bore of a master cylinder. The witness emphasized that the importation does not produce a measurement but merely reflects the difference from a known measurement. He testified that all calipers give measurements; that there are none which give comparisons only; and that the importation does not measure but rather performs the function of gauging. He said that he had always thought of the import as a gauge but did not know why. Gauging, he stated, meant the checking of material to obtain an absolute measurement or a comparison.

As its first witness, defendant called Arthur G. Strang of the National Bureau of Standards, an expert in the field of metrology (the science of weights and measurements), whose expertise encompassed the subjects of calipers and dial bore gauges. The witness testified that a caliper is a special type of gauge and that the import in issue is a

caliper or, more specifically, an indicating caliper.[2] He further testified that it is not necessary for an instrument to have legs or jaws to be a caliper, in which connection he noted that a so-called gauge block caliper and a particular type of micrometer caliper are both calipers despite the fact that they lack legs or jaws. He further testified that while some calipers give absolute measurements, others, such as the present import and an instrument depicted in defendant's exhibit F, give comparative readings only.[3] In addition, the witness noted that a publication prepared by the Bureau of Standards, which describes the various types of tests that are run for the government and private industry in the calibration of instruments, lists devices similar to those in issue under the subheading "length and diameter calipers."

Defendant's second witness, John H. Worthen, chief engineer for the Standard Gauge Company, Poughkeepsie, New York, testified that his company produces dial indicators, dial bore gauges, dial snap gauges, fixed snap gauges, plugs and rings. Prior to that, he was employed by the Federal Products Corporation, Providence, Rhode Island, for some 28 years as research and development engineer, designing and developing dial indicators, dial bore gauges, and other calibrating machines. The witness is concededly an expert in the field of metrology and has developed a dial bore gauge similar to the importation in issue. The witness testified that both the importation and the instrument depicted in defendant's exhibit F are indicating calipers and function in essentially the same manner in that they do not give absolute numerical measurements but must be used in conjunction with a master ring, a set of gauge blocks or some other known size to get an absolute numerical measurement. The witness stated that there are a variety of calipers; that some record absolute measurement while others give comparisons only; and that the importation is a caliper that gives numerical results but not absolute measurements.

It is to be noted that no expert witnesses were called by plaintiff which is not without significance considering that the testimony of defendant's two highly qualified witnesses demonstrates that while there are calipers which give absolute measurements, there are also calipers which give only comparisons; that there are also many forms of calipers which do not have conventional jaws or legs; and finally, that the imported dial bore gauges are calipers.

---

[2] *Webster's New International Dictionary, Second Edition* (1956), defines an "indicating caliper" as "A form of caliper in which the error in the size of the work is indicated by a dial gauge."

[3] Defendant's exhibit F is composed of a screwdriver-type handle, two legs or jaws, a dial, and a spring-lever mechanism. It is operated by squeezing the lever to collapse the jaws and inserting them into the internal diameter to be measured. When the lever is released, the jaws spring back making contact with the diameter being measured, and the amount of deviation between the diameter of the article and the master is registered on a dial.

We turn now to the lexicographic authorities which define the term "calipers" as follows:

*Audel's New Mechanical Dictionary* (1960)

Calipers—Instruments to measure internal and external diameters or *calibres* of cylindrical pieces; they usually consist of two curved pieces of steel, hinged together with a tight joint at one end, the distance between the *points* representing the measurement taken.

*The Random House Dictionary of the English Language* (1969)

Caliper 1. Usually, calipers. an instrument for measuring thickness and internal or external diameters inaccessible to a scale, consisting usually of a pair of pivoted legs adjustable at any distance.

These two lexicographic authorities indicate that calipers *"usually"* have two legs or jaws.[4] It must be added, however, that the use of the term "usually" in these definitions indicates that not all calipers have legs or jaws. See e.g., *Buchanan Electrical Products Corp.* v. *United States*, 65 Cust. Ct. 570, C.D. 4140 (1970), where the dictionary definition of "tubes" as "usually long" did not preclude the classification of short tubes under the common meaning of the term. And see also *National Silver Co.* v. *United States*, 64 Cust. Ct. 92, C.D. 3964 (1970) (appeal pending), where the court pointed out that the dictionary definition of "mugs" as being "usually cylindrical" implied that some mugs are not cylindrical.

It is to be observed, however, that *Webster's New International Dictionary, Second Edition* (1956), does not use the word "usually" in relation to legs or jaws, thus causing an area of apparent disagreement. Thus, *Webster's* defines the term "caliper" as follows:

*caliper* n. 1. a. Usually in *pl.* An instrument with two legs, usually curved, fastened together, in *firm-joint calipers*, with a rivet or screw or, *in spring calipers*, with a spring and pivot. They are used for determining the thickness or diameter of objects or the distance between surfaces, the caliber of a cylindrical hole, etc. * * *

Defendant's expert witness Strang, it is to be noted, indicated that while this definition was correct, it was not "all inclusive" and failed to include the importation and other similar instruments which were commonly known as calipers. What is more, when we have a situation where the lexicographic authorities are not in agreement, the testimony of competent witnesses as to common meaning is entitled to great weight. *United States* v. *Scruggs-Vandervoort-Barney Dry Goods Co.*, 18 CCPA 279, 282–83, T.D. 44450 (1930). And this is particularly true

---

[4] To similar effect, the *Summaries of Trade and Tariff Information, Schedule 7,* Vol. 2, T.C. 322 (1970), prepared by the Tariff Commission, state that "[c]alipers * * * *typically* consist of a pair of hinged legs with a vernier reading device and are used to determine the diameter or thickness of objects, or the distance between surfaces." [Emphasis added.]

where, as here, two highly qualified experts in the field of metrology do not consider it necessary for calipers to have jaws or legs. See *United States v. A. J. Taylor*, 48 CCPA 97, C.A.D. 772 (1961).

We consider now plaintiff's other contention that since the importation does not give absolute measurements, its function is to gauge and not to measure, and it, therefore, cannot be considered a caliper whose function is to measure. Consulting *Webster's New World Dictionary of the American Language, College Edition* (1962), we find the verb form of "gauge" defined as follows:

> v.t. 1. to measure accurately by means of a gauge. 2. to measure the size, amount, extent, or capacity of. 3. to estimate; judge; appraise. 4. to bring to correct gauge; make conform with a standard. * * *

This definition points out that the function of all calipers is to gauge, and that for our purposes here, the terms "gauging" and "measurement" can be used interchangeably. We find it of no consequence that the imported caliper does not produce an absolute measurement but only provides a comparison.[5] For the testimony regarding the "inside adjusting caliper" shows clearly that some calipers do not give absolute measurements *per se*. Furthermore, "indicating calipers" by definition do not give absolute measurements, as indicated in *Webster's New International Dictionary, Second Edition* (1956):

> indicating caliper—A form of caliper in which the error in the size of the work is indicated by a dial gauge.[6]

And in this connection, defendant's witnesses both testified that the imported merchandise is described by the term "indicating caliper."

Misplaced is plaintiff's reliance on *Frank P. Dow Co., Inc., et al. v. United States*, 60 Cust. Ct. 98, C.D. 3274 (1968). In *Dow*, articles described as dial indicators, which were used exclusively in valve gappers to measure valve clearances in automobile engines, were held to be properly classified under item 710.80 as parts of non-optical measuring or checking instruments, apparatus, and machines, rather than under item 678.50 as machines not specially provided for. But this is in no way determinative of the issue here. For here there is agreement that the importations are described by item 710.80 as non-

---

[5] It is interesting to note that in a sense all measurement is based on comparison, and thus is a form of gauging as seen from the following definition in *Van Norstrand's Scientific Encyclopedia, Third Edition* (1958):

> MEASUREMENT. A fundamental process in all production systems, generally involving comparison with some accepted standard or a mating part. The significance of a measurement is determined by the degree of accuracy to which elements may be measured. * * * Accuracy of size implies comparison with some accepted standard; in linear measurements, the fundamental unit is the yard, which is the distance at a temperature of 62° F. between two fine lines on gold plugs in a bronze bar at Westminister, England, and the meter. * * *

[6] See note 2, *supra*.

optical measuring or checking instruments; the question is whether the importations are also described under item 710.65 which is an *eo nomine* provision for calipers and thus more specific. In short, unlike *Dow*, the situation here involves a competition between item 710.80, a residuary provision, and item 710.65, a more specific provision.

We hold in conclusion that the imports here involved fall within the common meaning of the term "caliper" and that they were therefore properly classified under item 710.65. The protest is overruled and judgment will be entered accordingly.