**MARUBENI AMERICA CORPORATION,**
Plaintiff,

v.

**UNITED STATES, Defendant.**

**Slip Op. 96–24.**
**Court No. 91–10–00730.**

United States Court of
International Trade.

Jan. 23, 1996.

Fitch, King and Caffentzis, Richard C. King, Esq., New York City, for plaintiff.

Frank W. Hunger, Assistant Attorney General, Washington, DC; Joseph I. Leibman, Attorney-in-Charge, International Trade Field Office, Commercial Litigation Branch, Civil Division, United States Department of Justice, James A. Curley, Esq. (Jacob D. Diamond, Office of the Assistant Chief Counsel, United States Customs Service, of counsel), New York City, for defendant.

*Opinion and order*

NEWMAN, Senior Judge:

█ Plaintiff moves pursuant to CIT Rule 59(a) for rehearing of this court's decision in Slip Op. 95–168 of October 3, 1995, 905 F.Supp. 1101, which granted defendant's cross-motion for summary judgment dismissing this action. Familiarity with the initial opinion is assumed herein. At this juncture, it must be noted that most of the points now raised by plaintiff are a reargument of matters previously addressed, with perhaps some further elaboration and emphasis. Such rearguments are not a proper purpose for a motion for rehearing. *Simpson v. Liberty Mut. Ins. Co.,* 148 F.R.D. 621 (W.D.Ark., 1993); *Keyes v. National R.R. Passenger Corp.,* 766 F.Supp. 277 (E.D.Pa.1991). *See also, Channel Master, Div. of Avnet, Inc. v. United States,* 11 CIT 876, 877, 674 F.Supp. 872, 873 (1987), *aff'd,* 856 F.2d 177 (Fed.Cir.

1988); *Oak Laminates v. United States*, 8 CIT 300, 601 F.Supp. 1031 (1984), *aff'd*, 783 F.2d 195 (Fed.Cir.1986). However, the court finds that the issues discussed below are of sufficient complexity to merit further review and supplemental explanation herein.

For the reasons set forth below, plaintiff's motion is denied.

## I.

■ When a tariff term is not specifically defined in the Harmonized Tariff Schedule of the United States (HTSUS) and its intended meaning is not indicated in its legislative history, the term's correct meaning is its common meaning. *Mita Copystar America v. United States*, 21 F.3d 1079 (Fed.Cir.1994). In contending that the internal spiral ridges and grooves of the imports fall within the common meaning of "threads," as defined in various lexicographic, scientific, and encyclopedic authorities, plaintiff stressed *structural form*, as to which there is no dispute of fact. However, to the extent that the common meaning of the term "threads" may have a *functional* as well as *structural* connotation, plaintiff posited that in performing its heat transfer function, the import's spiral ridges and grooves "transmit motion." Accordingly, argued plaintiff, the import's spiral ridges and grooves meet both the structural and functional connotations of the common meaning of "threads," and therefore, the imports are "threaded" within the definition of tubes and pipes in Note 1(h) to Chapter 74, HTSUS.

In support of its motion for rehearing, plaintiff now contends the declaration of defendant's expert Dr. Thomas J. Rabas, that in its function of heat transfer there is no "transmission of motion" from the spiral grooving to the refrigerant fluid, made transmission of motion a disputed issue of fact for trial. The court disagrees.

■ Solely in response to plaintiff's *bald contention* that the heat transfer function of the spiral grooving involves transmission of motion, Dr. Rabas explained in his declaration the mechanical concept of "transmission of motion" and opined that the fins and grooves of the imported product do not transmit motion within the meaning of that concept. Rabas Decl. at 4. Counsel for plaintiff, however, has submitted no affidavit or any other evidence whatever either affirmatively substantiating plaintiff's factual assertion as to transmission of motion, or in contravention of the Rabas declaration. Plaintiff's bald contention of fact regarding transmission of motion in the heat transfer function of the spiral grooving—unsupported by an affidavit or declaration of a competent witness, or by any other evidentiary support in the record—is patently insufficient to raise a genuine issue of fact for trial. Fundamentally, of course, factual contentions advanced by a party in support of a motion for summary judgment unsupported by affidavit or other evidence, are insufficient to raise a genuine issue of fact for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256–57, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Totes, Inc. v. United States*, 865 F.Supp. 867, 873 (C.I.T.1994), *aff'd*, 69 F.3d 495 (Fed.Cir. 1995); *Tropi–Cal v. United States*, 63 Cust. Ct. 518, 521, C.D. 3945, 1969 WL 13848 (1969).

■ In furtherance of its efforts to now demonstrate that transmission of motion is a "genuine" issue of fact for trial, plaintiff also maintains that the court impermissibly assessed the credibility of Dr. Rabas when noting that he was "a highly qualified engineering specialist in heating, refrigeration and airconditioning equipment and an expert in heat transfer." Op. at 1106. Rule 56(f) requires that "supporting and opposing affidavits * * * show affirmatively that the affiant is *competent* to testify to the matters stated therein." The observation in the initial opinion regarding the declarant's expertise in heat transfer is simply a finding in compliance with Rule 56(f) of the witness' competence, not credibility, relative to the issues addressed in the declaration. Since plaintiff submitted no evidence on the point, the court's reference to the Rabas declaration plainly does not suggest that a genuine issue of fact was "tried by affidavit," as mistakenly contended by plaintiff.

Plaintiff's assertion that the Rabas declaration is controverted by the declaration of Mr. Osamu Kawamata, Hitachi's Engineering Manager, submitted by plaintiff, is without basis. Kawamata, a mechanical engineer, does not even mention "transmission of motion" much less state that there is transmission of motion from the ridges and grooves to the refrigerant fluid. Rather, Kawamata states that the ridges and grooves of the imports "can properly be described as 'threads,' *because they contain as essential elements helical or spiral ridges on a cylindrical body.*" (Exh. 24, par. 8); and that the high lead angle, or low helix angle, of grooves and ridges on the imported tubes "is typical of threads used for purposes of motion, such as those on a ball point pen, and the toy top (plaintiff's Exhibit 23)" (Exh. 24, par. 12). Again, it is stressed that Kawamata states nowhere in his declaration that the spiral ridges and grooves *of the imports* transmit motion to the refrigerant fluid.

Plaintiff's contention that the Rabas declaration is inconsistent with defendant's Clevinger declaration is also completely groundless. In point of fact, Clevinger too expressly states that the ridges and grooves of the imports *do not* transmit power or motion (Decl., par. 4).

Also totally without merit is plaintiff's contention that Rabas' declaration is contradicted by *The Way Things Work* (1971), cited in Op. at 1107. Dr. Rabas explained that "the transmission of motion occurs when a moving body causes a second body to be placed in motion." Decl., par. 9. The above-mentioned authority states that "screw threads are used for the purpose of fastening (screws and bolts) and for the transmission of motion. *Id.* at 156. "Transmission of motion" relative to screw threads is illustrated by "a *rotating* screw spindle [that] imparts a longitudinal motion to a nut mounted on it." *Id.* (Emphasis added). Thus, in the example given, the *moving* (rotating) spindle causes the nut to *move* up or down the spindle. The foregoing example is consistent with and illustrates Dr. Rabas' explanation that a moving body (*e.g.,* a spindle) causes a second body (*e.g.,* a nut) to be placed in motion.

■ As stressed in the initial opinion, there is no dispute that when performing its function of heat transfer, the internal spiral grooving or fins of the imported tubes do not rotate or otherwise move to produce motion in the refrigerant fluid. Rather, the refrigerant fluid (normally moving through the tubes under the impetus of a compressor) simply circulates through the non-moving tube's internal spiral configuration, and although the fluid's directional movement of flow through the tube is clearly *affected* by the internal stationary spiral grooving (indeed, that is its purpose), there is no "transfer of motion" from the stationary grooving to the fluid. As stated by affiant Hajime Ichiki, plaintiff's Marketing Manager, "[t]he pattern of grooves and ridges causes the fluid to rotate up and around the tube, as described in Hitachi U.S. Patent 4,658,892, *as it flows through the tube, pushed by the compressor.*" Exh. 2, par. 13 (emphasis added). There is not the slightest suggestion in either the affidavit or referenced patent that the grooves and ridges move in any fashion to "transmit motion" to the fluid. In point of fact, the patent is clear that the heat transfer characteristics of the imports reflect: (1) the effect of stirring the fluid *due to the unevenness of the inner surface;* (2) the effect of increase in surface area; and (3) the effect of variation in liquid film in the uneven portion.

The short of the matter is that plaintiff itself adduced no evidence supporting its contention concerning transmission of motion from the spiral grooving to the refrigerant fluid, and the court's consideration of the Rabas declaration on that point does not raise a genuine factual issue for trial.

## II.

■ Further, with regard to the Rabas declaration, while courts have relied primarily upon lexicons and other similar authorities, courts may and do look to the testimony of record to determine the common meaning of a tariff term, a question of law. *United States v. J.J. Gavin & Co.,* 23 CCPA 288, T.D. 48164, 1936 WL 3002 (1936); *United States v. Colonial Commerce Co., Ltd.,* 44 CCPA 18, C.A.D. 629, 1956 WL 8335 (1956); *United States v. Mercantil Distribuidora,*

*S.A.,* 43 CCPA 111, C.A.D. 617, 1956 WL 8351 (1956); *Atlantic Aluminum & Metal Distributors, Inc. v. United States,* 47 CCPA 88, C.A.D. 735, 1960 WL 8462 (1960). Such testimony may properly be considered simply as advisory and as aiding the memory and understanding of the court, and it is not binding and may be accepted or rejected as appears proper. *Tropical Craft Corp. v. United States,* 45 CCPA 59, C.A.D. 673, 1958 WL 7363 (1958); *Package Machinery Co. v. United States,* 41 CCPA 63, C.A.D. 530, 1953 WL 6076 (1953); *Ameliotex, Inc. v. United States,* 65 CCPA 22, C.A.D. 1200, 565 F.2d 674 (1977).

 In the initial opinion, after reviewing the extensive lexicographic, scientific and encyclopedic authorities called to the attention of the court, as well as the uncontradicted Rabas declaration, the court agreed with the government that *as related to tubes and pipes,* the term "threaded" as used in Note 1(h) contemplates spiral grooving *for attachment or coupling of sections of tubes with complementary "threaded" components.* Op. at 1104. Dr. Rabas stated that the meaning of "threaded" as related to a tube or pipe refers to "[t]hreading * * * used to join two or more sections of pipe or tube" (Decl., at 3). Since tariff terms are presumed to carry the meaning given them in trade and commerce, testimony regarding the meaning of the term in the trade is highly relevant. *Ameliotex, Inc., supra.* Further, when lexicographic and technical authorities are inconclusive as to the common meaning of a term, the *uncontradicted* testimony of a competent expert witness is entitled to great weight, *United States v. Scruggs–Vandervoort–Barney Dry Goods Co.,* 18 CCPA 279, T.D. 44450, 1930 WL 2572 (1930); *Victor Machinery Exchange, Inc. v. United States,* 67 Cust. Ct. 231, C.D. 4279, 1971 WL 20959 (1971), and it is proper for the court to consider the interpretation commonly placed on a term in the particular industry involved. *United States v. Colonial Commerce Co., Ltd.,* 44 CCPA 18, C.A.D. 629, 1956 WL 8335 (1956). There is no dispute that the spiral grooving of the imports is not used for the purpose of coupling or attachment, and there is no error in relying on the Rabas declaration for the common meaning of "threads" as related to tubes and pipes.

## III.

As the court has determined that Customs' interpretation of the term "threaded," discussed above, is within the common meaning of that term, it is apparent that even if "transmission of motion" *in heat transfer* were to be factually established by plaintiff at a trial, such fact would not be material to whether the imports are "threaded" within the common meaning determined by the court. *Since indisputedly the spiral grooving of the imports is not used for attachment or coupling, the spiral grooving does not constitute "threads" as a matter of law, whether or not there is "transmission of motion" in the heat transfer function.* Consequently, whether or not the heat transfer function of the spiral grooving of the imports involves "transmission of motion" is neither a *genuine* nor *material* issue of fact.

## IV.

 Plaintiff contends that the court erred in rejecting the broad definitions of "threads" proffered by plaintiff connoting simply a configuration of spiral ridges and grooves around a cylinder. Specifically, plaintiff complains that the court overlooked, or discounted, at least three definitions from relevant lexicographic and other sources cited by plaintiff that express no criterion of function or purpose. Plaintiff urges that in determining the meaning of tariff terms, the court must take a liberal approach in favor of the importer, especially where the meaning of a tariff term remains in doubt. In that regard, plaintiff cites the well-established rule applied by courts in construing insurance policies containing terms susceptible to more than one interpretation that such ambiguous terms of the policy must be construed against the carrier and most liberally in favor of the insured, *Grayson v. Aetna Ins. Co.,* 308 F.Supp. 922, 926–27 (D.S.C. 1970). Plaintiff insists that similarly where a tariff term is susceptible to varied reasonable interpretations, the court must resolve the uncertainty against the government and defer to the importer's reasonable interpreta-

tion. Hence, plaintiff claims that the court erred in not accepting plaintiff's reasonable construction of the term "threads," based solely on the physical configuration of the spiral grooving, as the common meaning of the term.

Without belaboring the point, it suffices to state that even assuming *arguendo* that plaintiff's interpretation is reasonable—that in the context of defining pipes and tubes only physical configuration is relevant—the rule of interpretation relied on by plaintiff applicable to construing ambiguous insurance clauses in favor of the insured is based on policy considerations totally inapplicable to construction of tariff provisions. Further, the court disagrees with plaintiff that where there are two reasonable interpretations of a tariff term in a classification statute, and a substantial doubt remains as to the meaning Congress intended, the court is required to defer to the importer's interpretation.

It is not at all unusual, indeed it is normal in classification disputes coming before the court, to be presented by the parties with varied and sometimes inconsistent definitions of terms, with each party urging acceptance of the definition that favors the party's claimed classification. However, it does not follow from the foregoing that where doubt still remains after due consideration of the conflicting interpretations of the parties, the court must defer to the importer's interpretation, if reasonable.

In selecting among varied and inconsistent definitions in determining the common meaning of a tariff term, the Federal Circuit ruled in *Richards Medical Co. v. United States,* 910 F.2d 828 (Fed.Cir.1990), that "[w]here a tariff term has various definitions or meanings and has a broad and narrow interpretations, *the court must determine which definition best invokes the legislative intent.* Upon reviewing all relevant sources for determining the common meaning of the term, and for the reasons stated in the initial opinion, the court adheres to the government's interpretation of the term "threaded" in Note 1(h) as the meaning intended by Congress.

Plaintiff's contention that the court was required to defer to plaintiff's interpretation is rejected. In a somewhat reverse situation,

where it was the *government* that strenuously argued that it's reasonable interpretation was entitled to the benefit of any doubt, the court in *Semperit Indus. Products, Inc. v. United States,* 18 CIT ——, 855 F.Supp. 1292 (CIT 1994), at 1299, observed:

> The Court also rejects defendant's argument that the Court should uphold Customs' classification because the agency based its classification on a reasonable interpretation of subheading 4010.91.15 [footnote omitted]. * * * Defendant's argument is meritless because it misconstrues the Court's role in Customs classification cases. In such cases, the court conducts a trial *de novo.* [citation omitted.] Although Customs' decisions enjoy a presumption of correctness, the Court's duty in reviewing classification determinations 'is to find the *correct* result ..." *Jarvis Clark,* [*Co. v. United States* ], 2 Fed.Cir. (T) [70] at 75, 733 F.2d [873] at 878 [ (1994) ] (emphasis in original) (footnote omitted). *Implicit in this function is the Court's responsibility in classification cases not to exercise a deferential standard, but to exercise its own judgment as to what is the proper classification of the merchandise under review.*

*Id.,* emphasis added.

Continuing, *Semperit* stresses that in classification cases deference to Customs' interpretation is logically incompatible with the Court's role because the standard in these cases requires the Court to reject any interpretation, *however reasonable,* that the Court determines is incorrect, and therefore, deference in the customs classification context would necessarily and improperly subvert the Court's statutorily based review authority. *Id.* at 1300 (emphasis in original). Hence, in light of the foregoing rationale in *Semperit* based on *Jarvis Clark,* holding that a deferential standard is precluded in classification cases, *a fortiori* a deferential standard in favor of the importer cannot exist.

Plaintiff's claim of a deference owed by the court to the importer's interpretation is even more tenuous in light of *Lotto U.S.A., Inc. v. United States,* 12 CIT 187, 188, 1988 WL 18982 (1988), which held that where the lan-

guage of the TSUS provision did not provide a clear answer as to classification, and the importer's interpretation of the TSUS provision "has nothing to recommend it over the approach taken by the government," *the government's interpretation must prevail.*

■ Absent a showing of legal error in the construction of the term "threaded," Customs' classification decision must be upheld. *Mita Copystar America, supra* (On cross-motions for summary judgment in a classification case where plaintiff challenged only the government's legal construction, the CAFC noted: "Customs is an expert agency and its classifications are statutorily presumed to be correct. Therefore, absent a showing of legal error in the construction of a tariff term, * * * the trial court, should uphold a Customs classification decision."). However, *cf. Goodman Manufacturing, L.P. v. United States,* 69 F.3d 505 (CAFC 1995) (in valuation dispute, absent factual issue in motion for summary judgment, "the [statutory] presumption of correctness is not relevant," and the only issue was "whether Customs' decision is based on a permissible construction of trade statutes," citing *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984).

In sum, the foregoing authorities clearly preclude any concept of a deferential standard of statutory construction in classification cases in favor of the importer's reasonable interpretation.

## V.

Plaintiff also contends that in determining whether the imports were "threaded" within the common meaning of that term, the court erred in considering descriptive nomenclature applied in the trade since there is no claim of a "commercial designation" differing from the common meaning. It is undisputed that in trade parlance the imports are not referred to as "threaded," but rather are described as "finned," "micro-finned," or "grooved."

■ The court agrees with plaintiff that commercial designation, as such, is not an issue in this case. Nonetheless, there are longstanding rules in classification based on common meaning, that the common and commercial meanings are presumed to be the same; that Congress is presumed to know the language of commerce and to have framed tariff acts so as to classify commodities according to the general usage and denomination of the trade; that Congress ordinarily employs terms in their commercial sense; and that Congress is presumed to know how terms are used in the trade. *See* the numerous case authorities cited in Sturm, *Customs Law and Administration,* § 52.6. Accordingly, in determining the common meaning of "threaded" as used in connection with tubes and pipes, as defined in Note 1(h), the court is not required to close its eyes to the undisputed fact that the relevant industry, including Marubeni, does not refer to, represent, describe or market the imports as "threaded" tubes.

## VI.

Plaintiff further argues that the court ignored the undisputed fact that the term "threads" was used to describe certain internal spiral grooving for surface roughness in a scientific article authored by members of the faculty of the Chemical Engineering Department at Alexandria University, Alexandria, Egypt and published in the *Canadian Journal of Engineering,* cited in Op. at 1107. Notwithstanding use of the English language in the Canadian scientific journal by the Egyptian writers, such journal is not accepted here as an authority for the common meaning of "threads" in the United States, as claimed by plaintiff. In any event, the court previously noted that the Egyptian writers also applied the term "threaded" to a plastic sleeve *used to connect three sections of pipe,* which coupling or attachment function is consistent with the common meaning urged by the government and accepted by the court.

## VII.

■ Plaintiff also claims that the court erred in ignoring the Congressional intent in the TSUS/HTSUS conversion process. In essence, plaintiff again argues that the new HTSUS definition in Note 1(h), Chapter 74, which supersedes the prior undefined TSUS provision, must, absent evidence of contrary Congressional intent to change the classifica-

tion and rate of duty on plaintiff's merchandise, be applied by the court in such manner as not to result in an increase in the rate of duty assessed under the TSUS. Plaintiff's rationale is that the new Note 1(h) definition was simply inserted in the HTSUS in "passive acquiescence to language required by treaty," and reflects no intent to change the scope of the prior undefined provision in the TSUS. The court is unable to agree.

That changes in statutory language under the HTSUS in the classification of commodities may result in changes of classification and increases in the rate of duty is illustrated by the very recent decision of the court in *SGI v. United States*, 917 F.Supp. 822 (1996). In the *SGI* court's consideration of plaintiff's claim of the "tariff neutrality" intended by Congress in the TSUS/HTSUS conversion process, the court rejected plaintiff's contention that the HTSUS provision for various containers did not broaden or change the scope of the prior TSUS provisions for luggage. Plaintiff's reliance here on *Beloit Corp. v. United States*, 843 F.Supp. 1489 (1994), is misplaced. There, the court found circumstances not present here that justified a determination of no Congressional intent to change the classification of the goods.

The court quite understands the plight of importers faced with perhaps unexpected increases in duty rates resulting from changes in statutory language in the TSUS/HTSUS conversion process. Nonetheless, on the facts and circumstances of this case, the court must reject plaintiff's position that despite the definitional approach adopted under Note 1(h), the HTSUS tube and pipe provisions are simply a reenactment of the undefined TSUS provision.

## VIII.

■ Plaintiff further argues that the court erred in ignoring the time-honored rule in classification of merchandise under an *eo nomine* provision that "where a dutiable provision names an article without terms of limitation all forms of the article are thereby included unless a contrary legislative intent otherwise appears." *Smillie & Co. v. United States*, 11 Ct.Cust.Appls. 199, 201, T.D. 38966 (1921). The rule is well-settled in determining the scope of undefined and unqualified *eo nomine* tariff classifications generally, but would be entirely misplaced here in construing either the scope of subheading 7411.10.10, HTSUS, which is subject to the tightly drawn statutory definition in Note 1(h), or the term "threaded," in such definition, which obviously is not a tariff classification *per se*.

■ Note 1(h) is a definition intended to *limit*, not expand, the scope of merchandise classifiable under subheading 7411.10.10, HTSUS, and the term "threaded" is simply an *exception to the definitional limitation* of uniform wall thickness in Note 1(h). Consequently, it is apparent that the rule relied on by plaintiff for the scope of tariff classifications does not apply to determining what Congress intended by the term "threaded" in Note 1(h).

### CONCLUSION

Accordingly, upon full consideration of the parties' briefs, the court finds no error or irregularity, evidentiary or otherwise, in the initial decision and plaintiff's motion for rehearing is denied. *See United States v. Gold Mountain Coffee, Ltd.*, 8 CIT 336, 601 F.Supp. 212 (1984).